IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO. 18-00290 (AB)** |
| **DAVID SOMMERS** | : | |

<b><u>GOVERNMENT'S GUILTY PLEA MEMORANDUM</u></b>

**I.   INTRODUCTION**

Defendant David Sommers has agreed to plead guilty to Count Two of the Indictment charging him with Lacey Act false labeling, in violation of 16 U.S.C. §§ 3372(d)(2), 3373(d)(3)(A)(i), and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 16 U.S.C. § 3374(a)(1) and 28 U.S.C. § 2461(c), all arising from his illegal sale and shipments of protected terrapins in interstate and international commerce. The Court has scheduled a change of plea hearing for February 4, 2019.

**II.  PLEA AGREEMENT**

The government and defendant have reached a plea agreement in which the defendant will plead guilty to Count Two of the indictment. An executed copy of the plea agreement is attached as Exhibit A. The essential terms of the agreement are as follows:

The defendant agrees to plead guilty to Count Two of the Indictment charging him with Lacey Act False Labeling, in violation of 16 U.S.C. §§ 3372(d)(2) & 3373(d)(3)(A)(i), and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 28 U.S.C. § 2461(c), all arising from his knowingly false identification of diamondback terrapins transported and exported in foreign commerce in violation of applicable laws and regulations.

At the time of sentencing, the government will make whatever sentencing recommendation

as to imprisonment, fines, forfeiture, restitution, and other matters which the government deems appropriate; comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing including evidence relating to dismissed counts, and to the character and any criminal conduct of the defendant; address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

The parties stipulate that the offense involved pecuniary gain and commercial conduct and the defendant's Guideline range should be increased by two levels pursuant to USSG § 2Q2.1(b)(1).

The parties stipulate that the offense period includes the false labeling and trafficking of turtles from on or about August 7, 2014, to October 24, 2017. The defendant understands that the government will contend that the market value of the trafficked wildlife was at least $550,000 in furtherance of the criminal activity undertaken by the defendant and the defendant's Guideline range should be calculated based on this amount pursuant to USSG §§ 1B1.3 and 2B1.1(b)(1)(H). The government understands that the defendant has reserved his right to take whatever position on this issue that he deems appropriate.

The parties stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a).

The parties stipulate that, should the Court determine that the offense level is 16 or more, as of the date of this agreement, the defendant has assisted authorities in the investigation or

2

prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, resulting in a 1-level downward adjustment under USSG § 3E1.1(b).

The plea agreement contains a waiver of the defendant's appellate rights, which severely limits the circumstances under which the defendant can file an appeal.

At the time of sentencing, the government will move to dismiss Counts 1 and 3-6 of the Indictment as to this defendant.

### III. **ESSENTIAL ELEMENTS OF LACEY ACT FALSE LABELING**

The Lacey Act makes it unlawful to knowingly "make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been, or is intended to be … transported in interstate or foreign commerce." 16 U.S.C. §§ 3372(d), 3373(d).

The elements are:

1. That the defendant made or submitted a false record concerning or label for the identification of wildlife, to wit diamondback terrapins; and
2. The wildlife had been transported or intended to be transported in foreign commerce or exported; and
3. The defendant acted knowingly.

Ninth Circuit Model Jury Instruction 9.14

### IV. **MAXIMUM PENALTIES**

The maximum penalty for a Lacey Act violation is five years' imprisonment, a three-year

3

period of supervised release, a $250,000 fine, and a $100 special assessment. Full restitution for the value of the wildlife unlawfully taken from New Jersey may also be ordered.

## V.     FACTUAL BASIS FOR THE PLEA

At trial, the Government would present witnesses including a Canadian wildlife inspector; record keepers for PayPal, several banks, Federal Express, the U.S. Post Office, and a GPS tracking company; two New Jersey wildlife officers; the USFWS case agent and two undercover officers; and an expert witness herpetologist. The evidence in this case would show the following:

In August 2014, Canadian customs officials intercepted a package David Sommers had shipped via Federal Express to a person in Saskatchewan. Sommers labeled the package as containing a book/booklet and listed its value at $10 USD. Sommers listed his home address as the originating shipping address and paid the postage from a Federal Express account in his name. In fact, the package did not contain a book or booklet, but rather 11 live diamondback terrapin hatchlings concealed in two small pouches. The hatchlings are valued at approximately $99 to $1,320 USD. Sommers did not obtain the necessary permits and declarations required to ship terrapins lawfully internationally. The Canadian officials seized the package and referred the case to the U.S. Fish and Wildlife Service ("USFWS"). The agents determined that the defendant was a common link to many known reptile dealers and bank accounts that were associated with turtle trafficking.

Sommers resides in a single-family house in Levittown, Pennsylvania, located in the suburban area between Philadelphia and Trenton, New Jersey. He is a retired journalist who now works part-time as a courier for a law firm. His primary source of income is from the illegal sale of turtles.

4

Sommers deals exclusively in diamondback terrapins, a semi-aquatic turtle native to brackish waters of the East Coast. Diamondback terrapins do not live in the wild in Pennsylvania. Diamondback terrapin populations have been in sharp decline, primarily from the loss of habitat and as an incidental take in the shellfish industry. New Jersey had permitted the limited possession and taking of diamondback terrapins but changed its laws in 2016 to an outright taking, possession, and transport ban. As described in the indictment, the Convention on International Trade in Endangered Species of Wild Fauna and Flora, an international treaty to which the United States and Canada are signatories, lists the diamondback terrapins as a protected species and imposes extensive permit and trade limitations to ensure the species' survival.

The price of the terrapins depends on the age, size, sex, and shell markings. Hatchling sale prices range from $9 to $120. Adult females sell for several hundred dollars in the United States and thousands of dollars if they reach the Asian pet market. The record for an adult female diamondback terrapin with unique marking sold for $24,000 in China.

Sommers advertised primarily on kingsnake.com, a reptile trade website. His username was "Dave – PA." He typically listed for sale terrapin hatchlings and adult females. He claimed that all of his terrapins were captive raised. When he made a sale, he frequently included bonus terrapins in the package at no additional cost to the buyer. He primarily shipped the turtles in unmarked packages through the U.S. Postal Service and occasionally by Federal Express. He shipped them in an inhumane manner, wrapping them in socks or pouches and taping their legs to restrict movement. The return address on the packages was his home in Levittown.

Sommers's sales are consistent with selling terrapins collected from the wild and

inconsistent with legitimate breeders and turtle enthusiasts.   Among other things:

1. The quantity of terrapins Sommers had for sale dwarfed any other seller. To breed that many diamondback terrapins in captivity would have required a vast quantity of large holding tanks, filters, food, heat lamps, and incubation equipment; such an operation is not realistic for a lone individual to operate from a single-family house.
2. The pictures of his terrapins showed damage to their shells, and Sommers often described them as being aggressive when handled. Experts describe this as being consistent with wild turtles, which suffer natural injuries and are not accustomed to being handled by humans.
3. Turtle breeders do not ship the animals in manner that Sommers shipped them. They properly label the package, place the turtles in appropriate shipping containers, and do not include bonus turtles. They put great effort into breeding the turtles so do not give away additional animals for free. Such behavior is typical of traffickers who expect some turtles to die in transit and/or have obtained them from the wild at no cost.
4. Turtle breeders do not sell adult females, which are an essential component of their breeding stock. Instead, turtle poachers will take gravid females from the wild and then sell them once they have released their eggs.
5. The genuine turtle trade industry is small, and most participants exchange pictures of their stock tanks and specimens, as well as post information on breeding tips and techniques on Internet forums. Sommers has refused requests to show his breeding operation or the parents of hatchlings. He has also mentioned while communicating to customers -- including undercover agents -- that he bred his terrapins in a pond in his yard; no such pond exists.

From January through October, 2017, an undercover agent in New York responded to advertisements on kingsnake.com and made four controlled purchases of turtles. In total he purchased 17 diamondback terrapins for $1,394. An undercover agent in Wisconsin also made a purchase in April, 2017 for 100 hatchlings for $900. Sommers marketed all of the turtles as being captive bred. Sommers included several bonus turtles and did not label the packages as containing wildlife, in violation of postal regulations.

Subpoenaed records link Sommers' name and address to the email address (sommers35@verizon.net) he used for the advertisements. His signature on emails for the sales was "Dave Sommers, Levittown, PA." PayPal records corresponding to the transactions also come back to the defendant. He also had two shipping accounts with the U.S. Postal Service and

6

one with Federal Express that are in his name and linked to his shipments after making a sale of turtles.

On July 11, 2017, the agents obtained a search warrant to place GPS tracking devices on Sommers' two cars. The next day, New Jersey Division of Fish and Wildlife Conservations officers were on patrol in the Great Bay Management Area. The area is a public land and known habitat for diamondback terrapins. The area closes at sundown to the public. At 9:30 p.m., the officers observed Sommers on the main road. They saw a bucket in the backseat covered by a towel. Sommers told the officers that there was a turtle egg in the bucket. He agreed to show them the bucket, which in fact contained eight turtle eggs. He also showed them two empty coolers in his trunk. He stated he took the eggs from nests along the road. The officers observed several freshly dug holes and a nearby, disturbed turtle nest containing four eggs. The officers confiscated the eggs, informed Sommers that it was a violation of New Jersey law to collect eggs or disturb turtle nests, and issued him a citation for being in the wildlife area after hours.

On July 12, 2017 the GPS tracker revealed that Sommers had returned to the Great Bay area in his other car. Between midnight and about 2:00 a.m., he made several stops along the same road where the officers had stopped him. He then returned to his residence where an agent was conducting surveillance. Sommers parked in his garage and left the door open. The agent observed Sommers take small oval objects out of a plastic container in the car. Sommers would then carefully place each one in another container, which he brought inside the house. In total Sommers removed 85 objects believed to be eggs from the car.

GPS records continued to show Sommers' car going to the New Jersey shore after dark. On July 18, 2071, the agent again saw Sommers return to his garage and remove 188 apparent

eggs from the car. He also observed Sommers pour a substrate into the bin before placing the eggs inside. The substrate was consistent with vermiculite, a gardening material that is also used to incubate eggs. Sommers would also shine a flashlight on the eggs before placing them in the bin; this behavior is typical of incubating eggs and making sure the yolk portion is placed into the vermiculite. The agent observed similar behavior for 31 eggs on July 26.

On July 30, 2017, the tracker indicated that Sommers was back on the road in the turtle habitat. The agent went there the next day and observed freshly dug holes, disturbed nests, and human hand and fingerprints in the sand near the holes.

On August 1, 2017, the agent observed Sommers in Sea Island, New Jersey, another known diamondback terrapin habitat. He saw Sommers park along the side of the road and then walk slowly in the brush while crouched over. Sommers would then move his car ten yards up the road and repeat the process. Sommers would occasionally pick up small object and place them in a buck in his trunk. The agent saw freshly dug holes and egg fragments in the area where Sommers had been.

On October 24, 2017 agents executed a search warrant on Sommers' home. They recovered 3,442 diamondback terrapin hatchlings and 23 box turtles. They found a variety of turtle supplies including Oxytocin, a drug used to induce female turtles to release their eggs. There were also packaging and labels consistent with his shipments of turtles.

After the warrant, Sommers agreed to speak with the agents. He made several admissions, including:

1. He collects eggs and female turtles from New Jersey. He has been doing this for five to 15 years. He sells the female turtles a few days after they lay their eggs and does not breed them.

8

2. He hatches the turtles in an incubator. He lies on kingsnake.com that the turtles were captive bred. All of his turtles came from New Jersey.
3. He sells approximately 1,000 diamondback terrapins each year, earning between $50,000 and $75,000.
4. Sommers was informed by a postal inspect approximately four years ago that it was illegal to ship turtles using the U.S. Postal Service.
5. Sommers acknowledged New Jersey officers stopped him and told him that it was illegal to collect turtles and their eggs.
6. Sommers has shipped turtles to Canada about three times. He has done Internet research on the requirements for international shipments. He knows you have to file for a permit but does not do so. He labels them as booklets so they will not get stolen.

A few days after the warrant, Federal Express returned two packages to Sommers containing diamondback terrapins. Sommers surrendered the packages to the agent. The packages contained 118 diamondback terrapins. PayPal records show a known turtle trafficker paid Sommers a total of $11,544 for a series of shipment of terrapins during September and October; Sommers stated that she asked him to ship it to the New York address. Federal Express could not deliver the packages because other agents were investigating the apartment as part of a related case in Queens, New York.

The agents have reviewed records from banks, PayPal, money orders, and checks from 2011 to 2017. In total Sommers has earned $530,341 from selling diamondback terrapins. The agents have also valued the hatchlings seized during the warrant. The valuations depend on the domestic and international pet trade market and range from approximately $565,000 to $958,000.

9

This memorandum sets forth only the essential facts that would need to be proved to establish the elements of the offense charged.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney


/s/ JOAN E. BURNES
JOAN E. BURNES
Assistant United States Attorney


/s/ RYAN C. CONNORS
RYAN C. CONNORS
Trial Attorney

January 28, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused to be served a true and correct copy of the Government's Plea Memorandum on counsel for the defendant David Sommers, by e-filing and/or by electronic mail:

    Louis R. Busico, Esq.
    Steven M. Jones, Esq.
    Counsel for the defendant

    /s/ JOAN E. BURNES
    JOAN E. BURNES
    Assistant United States Attorney

Date: January 28, 2019